| | |
|---|---|
| In re<br><br>OTERO COUNTY HOSPITAL ASSOCIATION, INC. (d/b/a Gerald Champion Regional Medical Center; d/b/a Mountain View Catering)<br><br>Debtor. | Case No. 11-11-13686-JA |
| QUORUM HEALTH RESOURCES, LLC,<br>Plaintiff,<br><br>v.<br><br>Connie Bailey; Kathleen Bailey; Ray Bailey; Laurie K. Baker; Ronald Baker; Phillis Barnett; Janice Bergeron; Linda Bloom, as bankruptcy trustee for the estates of Douglas Whittaker and Veronica Whittaker; James R. Boren; Martha Bunsen; Rodney Bunsen; Helen Burton, both individually and as personal representative of the estate of David L. Burton (deceased); Mary Jane Callaway; Robert Callaway; Kelly Capece, as personal representative of the estate of Susan Schwarzenegger (deceased); Tony S. Chavez; Rita Chavez; Maria Nora Coyazo; Theresa Crawford; James Cross; Wanda Cross; Joel Crossno; Vivian Crossno; Marjorie Curtis; Sharon Degner; April Douthitt-Dugger; Charles B. Dugger III; Lavine M. Durden; Sandra J. East, both individually and as personal representative of the estate of Stanley B. East (deceased); Heide Emerson, as personal representative of the estates of Edna O. Chavez and John I. Chavez (both deceased); Kim Evans, as personal representative of the estate of Shirley Walls (deceased); Cynthia Fender; James Fender; | Adversary Proceeding No. _____ |

Judy Ann Ferguson; Otis Ferguson; Dale Fox; Phyllis Fox; Mickie Francis; Darrell Gilmore; Susan Gilmore; Frank Guerrero; Kent L. Gwynne; Elizabeth Gwynne; Melanie Hall, as personal representative of the estate of Alonzo A. Hall (deceased); Monica Herrera Valles, as personal representative of the estates of Mela Herrera and Jake Herrera (both deceased); Rachel Higgins, as personal representative of the estate of William O. Mills (deceased); Linda Hoefler; Paul Houston; Shirley Huebert; Lorraine Hutchings; Ivan Jackson; Nancy Jonsson; Anabelle Sim Lindley; Jearl Lindley; Peter Luna; Jennifer Luna; Makayla Luna; Maria Luna; Cecil Lunceford; Gayle Lunceford; Melissa Mackechnie; Gilbert C. Marquez; Marie Marquez; Manuel Martinez; Darleen Martinez; Karen McCullough; Michael McCullough; Arthur McKinney; Linda McKinney; Connie Mills; Shirley Modisett; Edna Morton; Royce Morton; Wiley Munsey; Ann Munsey; Lucinda Najar, as personal representative for the estate of James Silva (deceased); John F. O'Byrne; Laverne O'Byrne; Thomas Olive; Barbara Olson; Mary M. Quappe; David Quappe; James Pace, both individually and as personal representative of the estate of Barbara A. Pace (deceased); Marlene Pellman; Suzanne Rider, as personal representative of the estate of Ann Berry Rider (deceased); Herbert Robbins; Kelly Robbins; Kelly Robertson; James Rogers, as personal representative of the estate of David Warden (deceased); William Rogers; Patricia E. Rue; Gary T. Rue; Ray Sanchez; Chrystal Sauls; Glenneth Shafer; Joe Shafer; Phillip Ray Simmons, Sr.; Desiree Smith; Henry Smith; Mark A. Stewart; Paul Strunk; John Michael Sullivan, as personal representative of the estate of Tom T. Sullivan (deceased); Pat Sullivan; Catherine Swanson; Melvin Swanson; Kathy J. Swope; Jimmy L. Swope; Alice Tompkins; Val L. Turnbull, Jr.; Carel Turnbull; Jerome Ward; Ronald Whiteley; Marilyn Whiteley; Victor

2

| | |
|---|---|
| Wilkerson; any other Person asserting a Claim on account of (a) having undergone; or (b) a family member having undergone a procedure performed by Dr. Christian Schlicht and/or Dr. Frank Bryant.<br><br>                    Defendants. | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Quorum Health Resources, LLC ("QHR") alleges the following Complaint for Declaratory Judgment against Connie Bailey; Kathleen Bailey; Ray Bailey; Laurie K. Baker; Ronald Baker; Phillis Barnett; Janice Bergeron; Linda Bloom, as bankruptcy trustee for the estates of Douglas Whittaker and Veronica Whittaker; James R. Boren; Martha Bunsen; Rodney Bunsen; Helen Burton, both individually and as personal representative of the estate of David L. Burton (deceased); Mary Jane Callaway; Robert Callaway; Kelly Capece, as personal representative of the estate of Susan Schwarzenegger (deceased); Tony S. Chavez; Rita Chavez; Maria Nora Coyazo; Theresa Crawford; James Cross; Wanda Cross; Joel Crossno; Vivian Crossno; Marjorie Curtis; Sharon Degner; April Douthitt-Dugger; Charles B. Dugger III; Lavine M. Durden; Sandra J. East, both individually and as personal representative of the estate of Stanley B. East (deceased); Heide Emerson, as personal representative of the estates of Edna O. Chavez and John I. Chavez (both deceased); Kim Evans, as personal representative of the estate of Shirley Walls (deceased); Cynthia Fender; James Fender; Judy Ann Ferguson; Otis Ferguson; Dale Fox; Phyllis Fox; Mickie Francis; Darrell Gilmore; Susan Gilmore; Frank Guerrero; Kent L. Gwynne; Elizabeth Gwynne; Melanie Hall, as personal representative of the estate of Alonzo A. Hall (deceased); Monica Herrera Valles, as personal representative of the estates of Mela

3

Herrera and Jake Herrera (both deceased); Rachel Higgins, as personal representative of the estate of William O. Mills (deceased); Linda Hoefler; Paul Houston; Shirley Huebert; Lorraine Hutchings; Ivan Jackson; Nancy Jonsson; Anabelle Sim Lindley; Jearl Lindley; Peter Luna; Jennifer Luna; Makayla Luna; Maria Luna; Cecil Lunceford; Gayle Lunceford; Melissa Mackechnie; Gilbert C. Marquez; Marie Marquez; Manuel Martinez; Darleen Martinez; Karen McCullough; Michael McCullough; Arthur McKinney; Linda McKinney; Connie Mills; Shirley Modisett; Edna Morton; Royce Morton; Wiley Munsey; Ann Munsey; Lucinda Najar, as personal representative for the estate of James Silva (deceased); John F. O'Byrne; Laverne O'Byrne; Thomas Olive; Barbara Olson; Mary M. Quappe; David Quappe; James Pace, both individually and as personal representative of the estate of Barbara A. Pace (deceased); Marlene Pellman; Suzanne Rider, as personal representative of the estate of Ann Berry Rider (deceased); Herbert Robbins; Kelly Robbins; Kelly Robertson; James Rogers, as personal representative of the estate of David Warden (deceased); William Rogers; Patricia E. Rue; Gary T. Rue; Ray Sanchez; Chrystal Sauls; Glenneth Shafer; Joe Shafer; Phillip Ray Simmons, Sr.; Desiree Smith; Henry Smith; Mark A. Stewart; Paul Strunk; John Michael Sullivan, as personal representative of the estate of Tom T. Sullivan (deceased); Pat Sullivan; Catherine Swanson; Melvin Swanson; Kathy J. Swope; Jimmy L. Swope; Alice Tompkins; Val L. Turnbull, Jr.; Carel Turnbull; Jerome Ward; Ronald Whiteley; Marilyn Whiteley; Victor Wilkerson; any other Person asserting a Claim on account of having undergone, or a family member having undergone, a procedure performed by Dr. Christian Schlicht and/or Dr. Frank Bryant (such claimants are collectively, jointly and severally hereinafter called the "UTC").

**PARTIES**

1.  Plaintiff QHR is a limited liability company with its principal place of business in

the State of Tennessee.

2. QHR is informed and believes, and based thereon alleges, that the UTC were and are at all relevant times residents of the State of New Mexico or the State of Texas.

3. The UTC were and are creditors of the Chapter 11 bankruptcy estate of debtor Gerald Champion Regional Medical Center ("Debtor") in that Chapter 11 proceeding captioned In re Otero County Hospital Association, Inc. (d/b/a Gerald Champion Regional Medical Center; d/b/a Mountain View Catering) ("Chapter 11 Proceeding"). Some or all of the UTC also were and are plaintiffs in New Mexico state court litigation.

## JURISDICTION AND VENUE

4. This Court confirmed on August 7, 2012 the Third Amended Chapter 11 Plan of Reorganization for Otero County Hospital Association, Inc. submitted on June 20, 2012 ("Plan of Reorganization" or "Plan"), and has exclusive subject matter jurisdiction over the administration and enforcement thereof. The Plan of Reorganization included a partial settlement of the UTC's claims against QHR arising from the subject matter of the Plan. By the instant adversary proceeding, QHR seeks a judicial determination of its rights and duties with respect to the UTC arising from the subject matter of the Plan. This Court, having retained exclusive subject matter jurisdiction over the administration and enforcement of the Plan of Reorganization, has exclusive jurisdiction over the subject matter of this adversary action.

5. This Court has personal jurisdiction over QHR and the UTC.

6. Venue is proper in this Court because this is an adversary action arising out of the subject matter of the Plan.

## THE UTC LITIGATION

7. Beginning in April 2010, many members of the UTC filed multiple lawsuits against QHR, the Debtor and other defendants in Otero County District Court, New Mexico. Following the Debtor's initiation of Chapter 11 bankruptcy proceedings in this Court (Case No. 11-13686-j11), each of the UTC members filed proofs of claim. The majority of these UTC members also filed a series of related adversary proceedings, which were consolidated for administrative purposes in a case styled *United Tort Claimants v. Quorum Health Resources, LLC (In re Otero County Hospital Association, Inc.)*, Consolidated Misc. Adv. No. 13-00007-j. Twenty-three members of the UTC brought their claims against QHR in the Second Judicial District Court for the State of New Mexico in a proceeding styled *April D. Douthitt-Dugger, et al. v. Quorum Health Resources, LLC*, Case No. D-202-CV-2012-01798. The claims pending in the above described legal proceedings are hereinafter referred to collectively as the "Underlying Litigation."

## THE PLAN OF REORGANIZATION AND THE PARTIAL SETTLEMENT

8. The Debtor filed its Third Amended Chapter 11 Plan of Reorganization on June 20, 2012. The Plan was confirmed by this Court on August 7, 2012 through the entry of a Confirmation Order. The Confirmation Order approved a "Global Settlement," defined in Exhibit A, Paragraph 47 of the Plan as:

> … the global settlement agreed to by the Debtor, the QHR Entities, the United Tort Claimants and Nautilus pursuant to the mediation ordered by the Bankruptcy Court in the Chapter 11 Case as set forth in the Global Settlement Documentation.

9. The Plan defined "Global Settlement Documentation" in Exhibit A, Paragraph 48, of the Plan, as:

> … the term sheet and other documents attached hereto as <u>Exhibit C</u> and

6

any other agreement or document evidencing the Global Settlement.

10. Exhibit C of the Plan attaches the following documents:

    a. The parties' Term Sheet dated May 16, 2012 ("Term Sheet"); and

    b. The parties' Waiver of Defense Condition to May 16, 2012 Term Sheet, dated May 30, 2012 ("Waiver of Defense Condition").

11. The parties' Settlement Agreement, signed by them on dates in about September 2012 ("Partial Settlement Agreement"), evidences the Global Settlement, and is therefore also "Global Settlement Documentation" within the meaning of the Plan.

12. The term "Global Settlement Documentation" used in the Plan, which was incorporated into the Confirmation Order, means the Term Sheet, Waiver of Defense Condition and Partial Settlement Agreement. The Global Settlement Documentation is attached hereto as Exhibit A.

13. This Court approved the Global Settlement, documented by the Global Settlement Documentation, under Article 7.5 of the Plan:

> The Global Settlement is fully incorporated herein by reference. The entry of the Confirmation Order shall constitute a finding and determination that each of the Global Settlement and the Global Settlement Documentation is (a) approved in all respects, including, without limitation, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, (b) fair, equitable and in the best interest of creditors and all other parties in interest; (c) the product of good faith arm's-length negotiations, (d) fully consistent with and does not violate the Nautilus Policies in any respect or manner whatsoever and (e) appropriate in all other respects and entered into in good faith. On the Effective Date, the Debtor shall be authorized to perform all of its obligations under the Global Settlement and the Global Settlement Documentation without further order of the Bankruptcy Court and the Global Settlement shall be deemed binding on all of the parties thereto. Without limiting the generality of the foregoing, each party to the Global Settlement, including, without limitation, the Debtor, QHR and Nautilus, shall be obligated to make all payments set forth in the Global Settlement on the terms and conditions set forth therein. Notwithstanding anything else set forth herein, in the event of a conflict between the Global

Settlement Documentation and the Plan, the terms of the Plan shall govern.

14. The Confirmation Order described in Article 11.1(c) of the Plan stated:

> Without limiting anything in Section 11.1(b), the Confirmation Order approves the Global Settlement and contains the findings set forth in Section 7.5 of the Plan.

15. The Settlement Agreement defined the term "Lexington/Ironshore Policies" as:

> . . . any and all available insurance policies, including but not limited to the combined applicable policy limits of Healthcare Professional Services Liability – Claims Made and Umbrella Liability – Claims Made Policy No. 6801409 issued by Lexington Insurance Company ("Lexington") to QHR and other insureds as enumerated or defined by the policy or otherwise deemed as such ("Lexington Policy"), and Follow Form Excess Policy No. IHHP079A issued by Ironshore Insurance Company ("Ironshore") to QHR and other insureds as enumerated or defined by the policy or otherwise deemed as such ("Ironshore Policy") and any other insurance policies Lexington or Ironshore has issued to QHR (which, with the Lexington Policy and the Ironshore Policy, are collectively referred to as the "Lexington/Ironshore Policies");

16. Under Section A.1.a of the Settlement Agreement that was included in and incorporated into the Plan, QHR agreed to and did pay the UTC the sum of $5.05 million.

17. Under Section B.2 of the Settlement Agreement that was included in and incorporated into the Plan, the UTC agreed that:

> QHR and its present or former employees, agents, representatives, general partners, limited partners, divisions, parents, subsidiaries, related entities, principals, third party administrators, affiliates, receivers, insurers, reinsurers, heirs, executors, associates, directors, officers, attorneys, trustees, assigns, predecessors and successors, and related entities have not made, ***do not make and may not be construed as having made or making any representation about the Lexington/Ironshore Policies or whether, to what extent or under what circumstances coverage may exist under the Lexington/Ironshore Policies*** with the exception of the representations expressly enumerated in paragraph 3 of the Term Sheet.

(Emphasis added.)

18. Paragraph 3 of the parties' Term Sheet dated May 16, 2012 stated:

8

Except as stated in this paragraph, QHR will make no representations about the excess policies issued by Lexington and Ironshore ("Policies"), and will not represent that there is or might be coverage under the Policies under any circumstances, and will not represent that all conditions to coverage have been or might be satisfied. However, QHR will represent that:

a. It has paid all premiums for the Policies.

b. To the best of QHR's knowledge, the limits of the Policies have not been eroded by any other claim as of this date.

c. QHR has taken the position with Lexington and Ironshore that all applicable self-insured retentions have been satisfied with respect to the Personal Injury Claims.

d. QHR received a November 2, 2011 letter from Nautilus concerning payment of its limits, which QHR will produce to the UTC upon Nautilus' consent.

e. On October 7, 2011, the UTC made an oral settlement demand upon QHR to settle the Personal Injury Claims for the limits of the Nautilus policies and the Lexington/Ironshore Policies, and QHR received a letter from the UTC dated October 27, 2011 stating this demand. QHR demanded that Lexington and Ironshore pay this demand. Lexington and Ironshore refused.

f. QHR received a February 15, 2012 letter from the UTC demanding to settle the Personal Injury Claims for the limits of the Nautilus policies and the Lexington/Ironshore Policies. QHR demanded that Lexington and Ironshore pay this demand. Lexington and Ironshore refused.

19. As part of its administration and enforcement of the Plan, under Article 13.1(vii) thereof, this Court retained exclusive jurisdiction over enforcement of the Partial Settlement:

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code; or (b) arising in or related to the Chapter 11 Case or the Plan, including, without limitation, the following:

(vii) To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan, the Plan Documents, the Global Settlement (to the extent such controversies, suits and disputes involve the Debtor), or their interpretation, implementation, enforcement, or consummation.

20. The UTC has in the past contended that QHR had duties under the Plan in excess of what was specifically agreed to and in disregard to the specific agreed limitations on QHR's duties and representations. Specifically, the UTC previously alleged before this Court that to induce them to enter into the Settlement Agreement, QHR had fraudulently misrepresented the amount of available insurance and the absence of any other claims that could erode the Lexington policy in the future. After an evidentiary hearing, this Court decided by order dated November 17, 2017 that:

> UTC failed to prove that QHR fraudulently induced them to enter into the settlement on such terms, or otherwise made a materially false representation about the amount of available insurance or the absence of any other claims that could erode the Lexington policy in the future.

21. The UTC still contend that QHR is liable to them for having allegedly concealed, when entering into the Settlement Agreement, (a) the existence of the renewal of Lexington Policy No. 6801409 (which was applicable with respect to claims made and reported during the period of August 31, 2008 to August 31, 2010, and interrelated claims made and reported thereafter); and (b) the existence of a claim asserted against QHR by Natchez Regional Medical Center ("Natchez Claim"). QHR denies these allegations.

22. The UTC still contend that QHR is required by a duty of good faith and fair dealing implied into the Settlement Agreement to (a) agree that two Lexington policies rather than one apply to the UTC claims; (b) waive its claim for reimbursement from Lexington of its $5.05 million contribution to the partial settlement with the UTC; and (c) litigate the Coverage Action so as to make the limits of the Lexington/Ironshore Policies available solely to the UTC. QHR denies these allegations.

## CLAIM FOR DECLARATORY RELIEF

### (By QHR Against the UTC)

23. QHR realleges and incorporates by reference the averments in Paragraphs 1 through 23 above as if set forth herein.

24. A present and actual controversy exists between the UTC and QHR with respect to:

    a. Whether QHR made any representations to induce them to enter into the Settlement Agreement, other than those set forth in paragraph 3 of the Term Sheet dated May 16, 2012 attached as an exhibit to the Settlement Agreement incorporated into and made part of the Plan;

    b. Whether QHR is required to agree that two Lexington policies rather than one apply to the UTC claims;

    c. Whether QHR is required to waive its claim for reimbursement from Lexington of its $5.05 million contribution to the partial settlement with the UTC; and

    d. Whether QHR is required to litigate the Coverage Action so as to make the limits of the Lexington/Ironshore Policies available solely to the UTC.

25. A judicial determination is necessary and appropriate to resolve these controversies.

26. QHR therefore respectfully requests that this Court enter a declaratory judgment stating as follows:

    a. QHR made no representations to induce the UTC to enter into the Settlement Agreement other than those set forth in paragraph 3 of the Term Sheet dated May 16, 2012.

    b. QHR made no representation about "the Lexington/Ironshore Policies," defined in

11

the Settlement Agreement to include "Healthcare Professional Services Liability – Claims Made and Umbrella Liability – Claims Made Policy No. 6801409 . . . and any other insurance policies Lexington . . . has issued to QHR," to induce the UTC to enter into the Settlement Agreement.

c. QHR made no representations about "whether, to what extent or under what circumstances coverage may exist" under the "Lexington/Ironshore Policies" to induce the UTC to enter into the Settlement Agreement.

d. Under the Settlement Agreement, QHR has no duty to preserve insurance coverage under the "Lexington/Ironshore Policies" for the UTC's exclusive use, or to assist the UTC in obtaining insurance coverage thereunder.

e. The UTC are barred by the Plan from asserting in any judicial proceeding that QHR made any representations to induce them to enter into the Settlement Agreement other than those set forth in paragraph 3 of the Settlement Agreement incorporated into and made part of the Plan.

f. QHR has no duty under any legal theory to refrain from enforcing its rights in the Coverage Action in deference to alleged rights of the UTC, which rights were not provided in the Plan of Reorganization including the Settlement Agreement incorporated therein.

WHEREFORE, Plaintiff Quorum Health Resources, LLC, prays for a declaratory judgment against the UTC, and each of them jointly and severally, as follows:

1   QHR made no representations to induce the UTC to enter into the Settlement Agreement other than those set forth in paragraph 3 of the Term Sheet dated May 16, 2012.

2   QHR made no representation about "the Lexington/Ironshore Policies," defined in

the Settlement Agreement to include "Healthcare Professional Services Liability – Claims Made and Umbrella Liability – Claims Made Policy No. 6801409 . . . and any other insurance policies Lexington . . . has issued to QHR," to induce the UTC to enter into the Settlement Agreement.

3 QHR made no representations about "whether, to what extent or under what circumstances coverage may exist" under the "Lexington/Ironshore Policies" to induce the UTC to enter into the Settlement Agreement.

4 QHR made no representations about, and was not required to disclose, the Natchez Claim to induce the UTC to enter into the Settlement Agreement.

5 Under the Settlement Agreement, QHR has no duty to preserve insurance coverage under the "Lexington/Ironshore Policies" for the UTC's exclusive use, or to assist the UTC in obtaining insurance coverage thereunder.

6 The UTC are barred by the Plan from asserting in any judicial proceeding that QHR made any representations to induce them to enter into the Settlement Agreement other than those set forth in paragraph 3 of the Settlement Agreement incorporated into and made part of the Plan.

7 QHR has no duty under any legal theory to waive its claims to seek to enforce its rights in deference to alleged rights of the UTC which were not provided in the Plan of Reorganization, including the Settlement Agreement incorporated therein.

8 QHR shall be awarded its reasonable attorneys' fees, costs and such other and further relief as the Court deems just.

MODRALL, SPERLING, ROEHL,
  HARRIS & SISK, P.A.


*/s/ Paul M. Fish*_____
Paul M. Fish
500 Fourth Street Northwest
Suite 1000
Albuquerque, New Mexico 87102
Telephone: (505) 848-1800
Facsimile: (505) 848-9710
*paul.fish@modrall.com*

David E. Wood, *admitted pro hac vice*
John L. Corbett, *admitted pro hac vice*
BARNES & THORNBURG
2029 Century Park East, 3rd Floor
Los Angeles, California 90067
Telephone: (310) 284-3793
Facsimile: (310) 284-3894
*David.Wood@btlaw.com*
*John.Corbett@btlaw.com*

14